Argued and submitted September 14, 2021, decision of Court of Appeals and order of Workers' Compensation Board affirmed March 24, 2022

In the Matter of the Compensation of
Carl S. Ward, Claimant.

SAIF CORPORATION
and Robert S. Murray,
*Petitioners on Review,*

*v.*

Carl S. WARD,
*Respondent on Review.*

(WCB 17-03591) (CA A171025) (SC S068179)

506 P3d 386

Claimant, who leased a truck from Bob Murray Trucking (BMT) for the exclusive purpose of driving the leased truck to haul loads for BMT, was in an accident and filed a workers' compensation claim seeking coverage for his injuries. SAIF denied coverage after determining that claimant was a nonsubject worker under ORS 656.027(15). The Workers' Compensation Board reversed after finding that claimant was a subject worker and did not qualify for the exemption in ORS 656.027. SAIF sought judicial review of that decision. *Held*: Claimant did not have a sufficient interest in the leased equipment to furnish the equipment, did not qualify for the nonsubject worker exemption in ORS 656.027(15), and was entitled to workers' compensation coverage.

The decision of the Court of Appeals and the order of the Workers' Compensation Board are affirmed.

On review from the Court of Appeals.*

Beth Cupani, Appellate Counsel, SAIF Corporation, Salem, argued the cause and filed the briefs for petitioners on review.

Craig Miller, Miller Law, LLC, Portland, argued the cause and filed the brief for respondent on review.

Theodore P. Heus, Quinn & Heus, LLC, Beaverton, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

_____

* On judicial review of a final order of the Workers' Compensation Board. 307 Or App 337, 477 P3d 429 (2020).

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, and Garrett, Justices.**

NELSON, J.

The decision of the Court of Appeals and the order of the Workers' Compensation Board are affirmed.

Garrett, J., dissented and filed an opinion, in which Balmer, J., joined.

_____

** Nakamoto, J., retired December 31, 2021, and did not participate in the decision of this case. DeHoog, J., did not participate in the consideration or decision of this case.

**NELSON, J.**

This workers' compensation case requires us to decide whether a truck driver (claimant) who sustained injuries while driving a truck that he leased directly from a trucking company, with restrictions that prohibited him from driving the truck for the use of any other company, is a "subject worker" within the meaning of ORS 656.027 such that the trucking company is required to provide workers' compensation insurance coverage for claimant's injuries. SAIF and Robert S. Murray, the owner of Bob Murray Trucking (BMT), a for-hire carrier, seek review of the Court of Appeals' opinion affirming the final order of the Workers' Compensation Board (board). In that order, the board concluded that claimant was a subject worker of BMT under the workers' compensation laws and did not qualify for the exemption to "subject worker" status contained in ORS 656.027(15)(c). For the reasons described below, we agree with the board that claimant is a "subject worker" who did not qualify for the exemption in ORS 656.027(15)(c) and, accordingly, was entitled to workers' compensation coverage provided by BMT. We affirm the decision of the Court of Appeals and the Workers' Compensation Board's final order.

## I. FACTS

We take the facts from the board's findings, as set out in its final order. Those include the earlier findings of an administrative law judge (ALJ), as adopted by the board alongside its own factual summary.

BMT is a for-hire, interstate motor carrier that is in the business of hauling wood, steel, and general commodities. BMT is licensed by the federal Department of Transportation and its trucking operations are regulated by the Federal Motor Carrier Safety Administration. BMT is owned by Robert S. Murray.

Claimant worked as a truck driver for BMT between May and August 2016. To begin driving for BMT, claimant leased a tractor truck directly from BMT. Claimant signed a document entitled "Operator Lease/Independent Contractor Agreement." That agreement specifically stated that claimant "has not acquired, nor will [he] acquire by this

acceptance of the Lease Agreement, any proprietary right, security interests or equity in the lease vehicle." The agreement also provided that the lease payments, occupational insurance fees, and maintenance fees were to be deducted directly from claimant's paycheck.[1] In exchange, the agreement granted claimant the right to use BMT's truck to haul loads but "only in interstate trucking in the United States on behalf of [BMT]."

For hauling loads for BMT, claimant was compensated at a rate of 37 cents per mile. In addition to the lease agreement, claimant also signed an acknowledgement that he received a copy of the BMT "Driver's Manual," which provided additional rules and regulations for the use of the truck, including safety rules, rules of personal conduct and dress, and various additional restrictions. One such restriction prohibited carrying any additional passengers in the truck without first obtaining permission from BMT.

The lease agreement and manual not only outlined claimant's interest in the leased truck, they also provided additional information about BMT's compensation incentives, primarily based on claimant's adherence to the rules outlined by BMT, timely submission of paperwork documenting mileage and vehicle inspections, accurate mileage sheets and reporting logs, daily inspection reports, frequent communication with BMT dispatch, customer service and professional demeanor when hauling loads for BMT, availability, truck cleanliness and appearance standards, and safe driving records.

BMT also monitored claimant's use of the truck by requiring that he only drive assigned routes and questioning claimant if he deviated from the route or made an unscheduled stop at a rest stop. BMT paid and provided for the following resources and expenses: liability insurance, fuel, and various equipment (including a radio, tools,

---

[1] Under the terms of the agreement, the lease payments and insurance fees were required to be paid to BMT; the truck maintenance was the responsibility of the driver, though the driver could opt into paying additional fees to BMT for maintenance as part of its incentivized in-house service plan. The ALJ's findings indicate that claimant elected to participate in that program and, accordingly, maintenance fees were also deducted from claimant's paycheck.

flashlight, camera, and fire extinguisher). In addition, BMT placed its logo onto the truck to "identify the equipment as being in [BMT's] service" and prohibited claimant from making any changes to the appearance of the truck, particularly from placing his own signage anywhere on the truck. Although the lease agreement allowed claimant to identify other drivers who may be able to operate the truck for BMT, BMT reserved the right to "disqualify any driver provided by [claimant] who is determined to be unsafe by [BMT] in [BMT's] sole discretion." As noted above, the truck was to be used exclusively to haul loads for BMT.[2]

On August 9, 2016, claimant was operating the truck pursuant to the lease agreement by hauling a load for BMT. As required by the lease agreement, claimant had obtained BMT's permission for his girlfriend to ride in the passenger seat. During the drive, claimant began to experience difficulty with the truck's brakes and, eventually, claimant was unable to stop the truck. The truck flipped over. Claimant's girlfriend was killed, and claimant sustained serious physical injuries.

Claimant filed a workers' compensation claim with SAIF seeking benefits for the injuries that he sustained in the accident. SAIF denied that claim. Relying on ORS 656.027(15), which provides that an individual "who has an ownership or leasehold interest in equipment and who furnishes, maintains, and operates the equipment" does not qualify as a subject worker who is entitled to workers' compensation benefits, SAIF determined that claimant was not eligible for workers' compensation benefits from BMT. An ALJ agreed with SAIF's contention and upheld its decision to deny claimant benefits.

---

[2] There is some dispute in the record, particularly in the testimony of the parties involved, as to whether claimant could use the truck for personal purposes. The language in the lease agreement makes clear that the truck was only to be used for "interstate trucking in the United States on behalf of [BMT]" but BMT gave some indication in its evidence that claimant could use the truck for limited personal purposes, if needed. We need not decide that factual dispute because the possibility of limited personal use of the truck is not dispositive here. For clarity, however, we note that references in this opinion to claimant's "exclusive" use refer to the prohibition in the lease agreement that prevented claimant from using the equipment to haul loads for any company other than BMT. We do not use "exclusive" as a way of deciding any factual dispute between the parties.

The claim came before the Workers' Compensation Board which disagreed with the ALJ and reversed the decision. In doing so, the board determined that claimant was unable, under the terms of the lease agreement between him and BMT, to "furnish" the truck to BMT because he had no transferable interest in the truck. Accordingly, the board held that claimant did not qualify for the exemption in ORS 656.027(15)(c) and was a subject worker entitled to workers' compensation benefits.

SAIF and BMT (collectively, SAIF) sought judicial review, arguing that claimant was not a subject worker of BMT and that he was exempt from workers' compensation coverage under ORS 656.027(15)(c). In response to the board's conclusion, SAIF argued that a truck is "furnished" under that exemption when a driver makes the equipment available to haul loads of goods for the carrier, regardless of whether the driver makes that same equipment available to other carriers, and that no transferable interest is required under the statute. SAIF contended that claimant met the terms of the exemption in ORS 656.027(15)(c) because he had a leasehold interest in the truck, as evidenced by the lease agreement between the parties, and he furnished the truck to BMT when he hauled goods for them. In response, claimant asserted that the board had correctly decided that a driver must have a transferable interest in the equipment (here, the truck) in order to "furnish" it and, thus, claimant did not qualify as a nonsubject worker under the exemption and was entitled to workers' compensation insurance coverage from BMT.

The Court of Appeals affirmed the order of the Workers' Compensation Board. *SAIF v. Ward*, 307 Or App 337, 347, 477 P3d 429 (2020). To reach that conclusion, the Court of Appeals took a comprehensive approach to evaluating the workers' compensation statutory framework and the requirements for the subject worker exemption described in ORS 656.027(15). As a preliminary matter, the Court of Appeals explained that, in its view, the text of ORS 656.027(15) contains two independent and separate requirements: (1) that the worker has an ownership or leasehold interest in the equipment; and (2) that the worker must furnish, maintain, and operate the equipment. *Ward*,

307 Or App at 340. That court noted that the phrasing of the statute indicates that the first requirement—the ownership or leasehold interest—is distinct from the second requirement—furnishing, maintaining, and operating the equipment. *Id.* Then, that court began to examine the specific language in ORS 656.027(15) by first defining the terms in the statute, "furnish" and "leasehold interest," to resolve the statutory construction question presented in this case. *Id.* at 340-41.

The Court of Appeals first defined "furnish." That court concluded that, under the statute, a driver furnishes equipment "by providing or supplying that equipment to a for-hire carrier." *Id.* at 341. That court next turned to the meaning of the phrase "leasehold interest," explaining that "a leasehold interest, at a minimum, means that the claimant must have the 'right to possession and use.'" *Id.* at 343. Then, that court considered how the terms relate to each other within the statute itself, concluding that the use of both of the terms in ORS 656.027(15) implied that an interest beyond the mere right to possess and use the equipment was required to qualify for the exemption:

> "[U]nder the plain meaning of the statutory text, a driver can 'furnish' equipment to a carrier by providing the equipment in service of the carrier—here, by producing the equipment to haul loads for the carrier. A driver can have a 'leasehold interest' in the equipment if the driver has the right to possess and use it. However, if the leasehold interest conveys no right of possession, use, or control beyond allowing the driver to furnish, maintain, and operate the equipment in service of the carrier, the lease is no more than a paper trail to give form to what is in substance actually the use of company equipment by a subject employee."

*Id.* at 343. Accordingly, the Court of Appeals concluded that ORS 656.027(15) "requires a leasehold interest that exceeds the right to furnish the equipment to the carrier such that the driver has a right to possess, use, and control the equipment *for purposes other than providing it to the carrier.*" *Id.* (emphasis added).

After it laid out the applicable definitions and legal principles, the Court of Appeals applied those principles to the facts of this case to decide if claimant met the requirements

of the statutory exemption in ORS 656.027(15). That court reiterated that the lease limited claimant's possession and use of the truck to a substantial degree through its requirement that the truck be used to haul loads exclusively for BMT. *Id.* at 344. In that court's view, the leasehold interest in the truck did not transfer sufficient rights in the truck to meet the requirements of the ORS 656.027(15) exemption. *Id.* at 347. Although the agreement between claimant and BMT purported to be a "lease" by its title, it "did not confer any interest in the leased vehicle beyond the authority to use it in BMT's service and under BMT's direction." *Id.* at 346-47. Without a sufficient leasehold interest, the Court of Appeals concluded that claimant was a subject worker and was entitled to workers' compensation benefits. *Id.* at 347.

SAIF petitioned for review before this court, arguing that the plain text of the statute and the legislative history support its view that claimant was exempted from workers' compensation coverage under ORS 656.027(15). Claimant filed a response. We allowed review to consider whether the exemption in ORS 656.027(15) removes claimant from qualification as a "subject worker" for purposes of the workers' compensation statutes.

## II.   ANALYSIS

A "subject worker" is a worker who is subject to the workers' compensation statutes. *Former* ORS 656.005(28) (2019), *renumbered as* ORS 656.005(28)(c) (2021). There are two steps involved to determine whether an individual qualifies as a "subject worker." The first step is to determine whether the individual qualifies as a worker. Under *former* ORS 656.005(30) (2019), a "worker" is "any person, including a minor whether lawfully or unlawfully employed, who engages to furnish services for a renumeration, subject to the direction and control of an employer."[3] If an individual does not meet the definition of a "worker" in that statute, then the inquiry ends and that individual is not subject to the workers' compensation laws. *S-W Floor Cover Shop v. Natl.*

---

[3] The definition of "worker" was later renumbered to ORS 656.005(28)(a) (2021) and the language was slightly amended. The amendment to the language does not impact this case and we cite to the statutory language as in effect at the time of this case.

*Council on Comp. Ins.*, 318 Or 614, 621, 872 P2d 1 (1994). Here, SAIF concedes that claimant meets the requirements to be considered a "worker," subject to the direction and control of BMT. Thus, the focus turns to whether claimant is a "subject worker" within the scope of the workers' compensation statutes. That question is answered by moving to the second step of the "subject worker" inquiry.

        The second step of the analysis requires a determination about whether a "worker" is subject to the workers' compensation laws. As a general rule, all workers are considered subject workers, unless an exemption applies. *See* ORS 656.027 ("All workers are subject to this chapter except those nonsubject workers described in the following subsections[.]"). Some of the exemptions include a worker employed as a domestic servant in a private home, sole proprietors that qualify as independent contractors, newspaper carriers, or persons performing services primarily for board and lodging for religious, charitable, or relief organizations. *See generally* ORS 656.027 (setting out a list of exemptions from subject worker status). The exemption at issue in this case is found in ORS 656.027(15) and identifies a nonsubject worker as

> "[a] person who has an ownership or leasehold interest in equipment and who furnishes, maintains and operates the equipment. As used in this subsection 'equipment' means:
>
> "(a)   A motor vehicle used in the transportation of logs, poles or piling.
>
> "(b)   A motor vehicle used in the transportation of rocks, gravel, sand, dirt or asphalt concrete.
>
> "(c)   A motor vehicle used in the transportation of property by a for-hire motor carrier that is required under ORS 825.100 or 825.104 to possess a certificate or permit or to be registered."

This case considers whether a worker qualifies for the exemption laid out in ORS 656.027(15) when the worker leases equipment from the lessor subject to the restriction that the equipment must be used exclusively for the lessor's purposes.

SAIF argues that the plain text of the statute sets forth only two requirements to qualify as a nonsubject worker: (1) the worker must have a leasehold interest in equipment, which SAIF defines as the right to possess and use the equipment, and (2) the worker must furnish, maintain, and operate said equipment. SAIF contends that the Court of Appeals acknowledged that claimant is within the scope of the exemption if the court only looked to the individual plain meaning of the terms at issue—"leasehold interest" and "furnish"—but nevertheless incorrectly inferred more restrictive meanings for those terms than the legislature intended by requiring that the "leasehold interest" in question be transferable, or provide proprietary rights that extend beyond mere possession and use. In SAIF's view, the board and the Court of Appeals erred in concluding that claimant fell outside of the scope of the exemption in ORS 656.027(15) and, instead, argues that claimant should be classified as a nonsubject worker.

Claimant, on the other hand, contends that he did not have a sufficient leasehold interest that granted him the ability to furnish the truck, as required to qualify for the subject worker exemption in ORS 656.027(15). According to claimant, the board and the Court of Appeals correctly determined that he was a subject worker under the workers' compensation laws. Claimant argues that, because he could not transfer ownership of the truck, and had no rights to drive the truck or haul goods for any company other than BMT, he did not have the right to possess, use, or control the truck beyond the ability to furnish it exclusively for BMT, the lessor. As claimant explains his situation, BMT's agreement was a "sham lease" that the Court of Appeals properly described as "no more than a paper trail to give form to what [was] in substance actually the use of company equipment by a subject employee." *See Ward*, 307 Or App at 343. Without a sufficient leasehold interest that provides the ability to furnish the truck for someone other than the lessor, claimant contends that he was a "subject worker" and entitled to workers' compensation coverage.

Before this court, the parties present competing arguments that focus primarily on the meaning of "leasehold

interest" in the statute. To resolve the question of statutory construction before us, we follow the established statutory interpretation framework laid out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

When interpreting statutory provisions, our primary goal as a court is to determine the intent of the legislature at the time it enacted the relevant statute. *See Gaines*, 346 Or at 171 ("This court remains responsible for fashioning rules of statutory interpretation that, in the court's judgment, best serve the paramount goal of discerning the legislature's intent."). To determine the intent of the legislature, we look to the text, context, and any helpful legislative history of the statute in question, keeping in mind that "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *Id.* (internal quotation marks and citations omitted). The context of a statute includes "other provisions of the same statute and related statutes, as well as the preexisting common law and the statutory framework within which the statute was enacted." *Fresk v. Kraemer*, 337 Or 513, 520-21, 99 P3d 282 (2004).

We begin with an examination of the relevant text. We note from the outset that we agree with the Court of Appeals that the operative text of the exemption in ORS 656.027(15)—describing a nonsubject worker as "[a] person who has an ownership or leasehold interest in equipment and who furnishes, maintains and operates the equipment"— suggests that the statute contains two separate and distinct requirements. *See Ward*, 307 Or App at 341 ("In order to be a nonsubject worker, claimant must both 'furnish' the truck and have a 'leasehold interest.'"). Because the parties to this case do not dispute that claimant maintains and operates the truck at issue here, the primary consideration is the meaning of the terms "leasehold interest" and "furnishes."

Neither of those terms are specifically defined in the workers' compensation statutes.[4] When interpreting a

---

[4] The term "leasehold interest" is defined separately within another subsection of ORS 656.027. As the Court of Appeals explained, however, that subsection, which specifically creates an exemption from subject worker status for taxicab

term or phrase that the legislature has not specifically defined, this court first considers the "plain, natural, and ordinary" meaning of the term. *DCBS v. Muliro*, 359 Or 736, 745-46, 380 P3d 270 (2016). To determine the "plain, natural, and ordinary" meaning of an undefined term, we will frequently consider how the term is defined in the dictionary, operating on the assumption that, "if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would have intended." *Muliro*, 359 Or at 746 (citing *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006)).

Neither claimant nor SAIF contends that the Court of Appeals incorrectly defined the terms in the agreement. As we understand it, the dispute in this case centers less around the plain meaning of the terms at issue, and more on how the legislature intended the two terms to interact with each other in the statute itself. The question in this case is not focused on the plain meaning of the terms "furnish" and "leasehold interest" in isolation, but rather what the legislature intended when it enacted the statutory exemption and how to best give meaning to the entire provision. With that said, the individual definitions are still an important piece of that consideration and, largely agreeing with the Court of Appeals, and the parties, as to those meanings, we reiterate those definitions here.

We begin with the definition of the word "furnish." "Furnish" is undefined within ORS 656.027(15). The word does not carry a specific legal meaning and we found no indication that the legislature intended the word to have any meaning beyond its ordinary one. The word "furnish," as used in ORS 656.027(15), operates as a verb and means, in its ordinary usage, "to provide or supply with what is needed, useful or desirable." *Webster's Third New Int'l Dictionary* 923 (unabridged ed 2002); *see State v. Glushko/Little*, 351 Or 297, 311, 266 P3d 50 (2011) ("[W]hen consulting dictionaries for the ordinary meanings of statutory terms, it is important to

---

and nonemergency medical transport drivers, makes clear both in its text and the accompanying legislative history that the definition of "leasehold interest" is specific to the "unique contractual relationship" between cab companies and owner-drivers of taxicabs. *Ward*, 307 Or App at 343 n 6. Accordingly, that definition does not carry meaning in this specific context.

examine the definition of the part of speech actually used in the statute at issue."). In this particular context, that definition implies that a driver can "furnish" a truck by producing it to haul loads for a carrier.

The plain meaning of the phrase "leasehold interest," as the legislature would have understood it when it added that language to the statutory exemption in 1979 is not as clear. *Webster's* defines the word "leasehold" with specific reference to real property. *See Webster's* at 1286 (defining leasehold as "land held by lease"). That definition is consistent with the meaning identified in *Black's Law Dictionary*, which defines leasehold as "[a] tenant's possessory estate in land or premises," and that same dictionary's definition of leasehold interest that explicitly references real property in the context of eminent domain. *Black's* 1027 (10th ed 2009). Neither of those definitions are particularly helpful in this context because we have been asked to consider the term as it applies to equipment—here, the truck leased to claimant by BMT—and not real property.

The term "leasehold interest" is also a legal term of art used in the field of secured transactions. "When the phrase is a term of art, drawn from a specialized field, courts 'look to the meaning and usage of those terms in the discipline from which the legislature borrowed them.'" *State v. McNally*, 361 Or 314, 322, 392 P3d 721 (2017) (quoting *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014)). The Court of Appeals looked to Oregon's Uniform Commercial Code to define "leasehold interest" based on its legal meaning within that field. *Ward*, 307 Or App at 342. In its briefing before this court, SAIF does not appear to argue against the use of that definition, though it does point out that Oregon enacted the UCC definition of "lease" and "leasehold interest" in 1989, after the language was added to the statutory exemption at issue in this case. Nonetheless, based on the reliance on the UCC definition below and the fact that both parties appear to accept that definition, it makes sense for us to at least consider the meaning of "leasehold interest" within the UCC as a possible meaning that the legislature may have considered when it adopted ORS 656.027(15).

Oregon's Uniform Commercial Code on Leases, contained in ORS chapter 72A, governs "any transaction, regardless of form, that creates a lease," including the lease created in this case. *See* ORS 72A.1020 (defining the scope of ORS chapter 72A). The UCC defines a "leasehold interest" as "the interest of the lessor or the lessee under a lease contract," ORS 72A.1030(1)(m), and a "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration," ORS 72A.1030(1)(j). In its most basic form, then, under the UCC, a "leasehold interest" requires that the lessee have a right to possess and use the equipment.

Claimant also suggests an alternative plain meaning of "leasehold interest." Under the Oregon Department of Transportation, Motor Carrier Transportation Division's own regulations, a lease must convey "*exclusive* possession, use, and control of the leased vehicle." OAR 740-045-0100(2)(c) (emphasis added). The administrative rules that refer to that definition of "lease," however, only govern vehicles operated in intrastate commerce within Oregon and, like the UCC definition, that administrative rule was adopted after the "leasehold interest" language at issue in this case was added to the statutory exemption.

Although the plain meaning of "leasehold interest" is more complicated than the meaning of the word "furnish," the definitions considered above do carry similar language and suggest some themes that the legislature may have understood when it chose to include that language. At a minimum, the UCC and the ODOT regulations suggest that a leasehold interest requires "possession and use." We agree with both parties then that the "leasehold interest" in this case requires that the lessee (claimant) have the right to possess and use the equipment leased from BMT.

After identifying the plain meaning of the terms within the statutory exemption, we now consider those definitions in the text of ORS 656.027(15). When we insert those two definitions into the text of the statute, then a nonsubject worker includes a person who has an interest under a lease in equipment—that is, an agreement that transfers the right to possession and use of equipment—and who

provides or supplies said equipment. If we stop the inquiry here, looking solely to the ordinary usage of the terms in ORS 656.027(15) to determine the intent of the legislature in enacting the exemption, we might agree with SAIF that claimant fit the requirements of a nonsubject worker: Claimant entered into what purported to be a "lease agreement" with BMT, an agreement that indeed granted claimant the right to possess and use the truck, satisfying the minimum requirements of the plain meaning of a leasehold interest, and claimant produced, *i.e.*, "furnished," the truck when he provided services hauling products for BMT.

Claimant persuasively argues, however, that merely inserting the definitions into the statute does not explain why the legislature included both "leasehold interest" and "furnishes" in the statutory text. As claimant explains, if the requirement to "furnish" is satisfied by providing or supplying a piece of equipment that an individual has a mere right to possess and use for the person they are supplying the equipment to, then the two requirements are essentially duplicitous. In other words, a lease that grants a lessee a right to supply the equipment for exclusive use by the lessor does not actually grant a sufficient interest in the equipment for the lessee to "furnish" the equipment. Instead, claimant contends that the leasehold interest must transfer some legal interest beyond mere use and possession to give full effect to all of the terms of the statutory exemption—particularly the word "furnish."

As a general rule, when we interpret a statute to determine what the legislature intended, we attempt to do so in a manner that gives effect to all of the provisions of the statute where possible. *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 311, 297 P3d 1256 (2013). Said another way, when construing a statute to determine the intent of the legislature, this court will generally attempt to avoid a statutory construction that creates redundancy in the way that the statute is read. *See Blachana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 692, 318 P3d 735 (2014) ([R]edundancy, of course, is a consequence that this court must avoid if possible."); *State v. Kellar*, 349 Or 626, 636, 247 P3d 1232 (2011) ("Defendant's interpretation results in a redundancy, something that we seek to avoid in

interpreting statutes."). To interpret the statutory exemption as SAIF proposes takes meaning away from the legislature's intentional use of both "leasehold interest" and "furnish." Instead, we agree with claimant that the conjunctive nature of the statute suggests that a driver who has an ownership or leasehold interest in equipment (here, a truck) must separately be able to furnish that equipment beyond merely driving it for the lessor in order to satisfy the conditions of the exemption. That is to say, even if we accept SAIF's proposed plain text reading of the statute, the use of all of the words in the statutory exemption together leaves us unconvinced that the legislature intended mere possession and use to grant a leasehold interest sufficient to furnish that same equipment in satisfaction of the requirements of ORS 656.027(15).

In addition to the conjunctive nature of the language in the statute, the context and legislative history of ORS 656.027(15) assist us in concluding that the legislature did not understand the exemption to apply in claimant's situation. *See Gaines*, 346 Or at 171-72 (describing the combined role that text and context play in interpreting the legislature's intent when enacting a statute). The legislative history surrounding the creation of the subject worker exemption contained in ORS 656.027(15) provides important background information for determining what the legislature intended the exemption to cover and why it was created.[5] When the exemption at issue here was first enacted, then only applying to "person[s] who engage[] in transportation by motor vehicles of logs, poles and piling," the House Committee on Labor provided a committee summary of the proposed bill that described its effects as adding "[e]quipment owners/operators (who own and operate equipment for hire)" to the category of nonsubject workers. Testimony,

---

[5] The statute at issue in this case, ORS 656.027, has been amended many times since its initial enactment in 1965. The exemption implicated in this case was first added to the list of nonsubject workers in 1977. *See* Or Laws 1977, ch 817, § 2 (adding "person[s] who engage[] in transportation by motor vehicles of logs, poles and piling" to the list of nonsubject workers contained in ORS 656.027). In 1979, the "leasehold interest" language was added to the exemption. Or Laws 1979, ch 821, § 1. Finally, as relevant to this case, the "for-hire motor carrier" subsection was added in a 2005 amendment. *See* Or Laws 2005, ch 167, § 1 (adding for-hire carriers to the statutory exemption in ORS 656.027(15)).

House Committee on Labor, HB 2820, May 30, 1977, Ex A (statement of Rep Bill Markham). Representative Markham explained the purpose of the statutory exemption in the following statement:

> "HB 2820 would classify the log trucker who operates and maintains his own equipment as an independent contractor for the purpose of workers' compensation.
>
> "* * * * *
>
> "The single log truck operator owns and maintains his equipment. He has the right to select his jobs and may hire someone to drive his truck under certain circumstances."

*Id*.

In 1979, the statute was amended to include the "leasehold interest" language at issue in this case. Or Laws 1979, ch 821, § 1. At a hearing before the House Committee on Labor on that amendment, and a potential expansion to add language to encompass backhoes and similar equipment, a proponent of the proposed legislation, Jack Kalinoski, representing the Association of General Contractors testified that

> "[t]he Senate * * * felt it was appropriate to include those relatively few people who own equipment that is used for that kind of work so that if they contract out their services with their equipment, owning, maintaining, and operating their equipment, then no one would construe them to be employe[e]s of the person with whom they have contracted."

Tape Recording, House Committee on Labor, HB 2726, July 2, 1979, Tape 40, Side 1. Senator Groener, a member of that committee, then asked if the provision, as written, would allow an employer to lease equipment to an employee for exclusive use by the employer in an effort to escape providing workers' compensation coverage:

> "I have a question on that. What would prohibit me as a backhoe operator from leasing a backhoe from the employer for the purpose of avoidance of paying workers' comp? In other words, I work for Donald Drake. Donald Drake says, 'Groener, I'll lease you that backhoe and pay you so much for operating it,' and by doing so, it wouldn't be necessary for him to pay workers' comp."

*Id*. Kalinoski replied that he "did not feel this would happen but if it did his association would be the first to say

the statute was being abused" and that such abuse did not fall within the terms of the statute. *Id*. The following dialogue between Senator Groener and Kalinoski is especially informative:

> "[KALINOSKI]:   Well, the way the statute is worded, as it came from your committee in the Senate, Senator, is that he's required to both furnish, operate and maintain it. Now, if he were to, it seems to me, that if he were to obtain it from the same person with whom he is contracting, that the carrier would see through that immediately and say that's nothing but subterfuge.

> "But let me \*\*\* try to assist you, Senator. Let's assume that I wish to go into the business, and I lease a backhoe from the Donald M. Drake Company, as you're talking about, but use it on a [unintelligible] company project. Is there anything wrong with that?

> "[GROENER]:   Is there anything wrong with it if it's for the purpose of avoidance of workers' comp? Who's going to take care of that man?"

*Id*. Then, Kalinoski further clarified why the distinction of having control over the use of the equipment, rather than requiring exclusive use of the equipment for the employer and lessor, matters:

> "Well, because I want to be an independent contractor. I want to, so I go out and I lease a piece of equipment from where I can get it, under the best terms and conditions available to me, but *I want to use it on another project*."

*Id*. (emphasis added). Kalinoski's clarification indicates that he considered the right to use the equipment for multiple jobs of the lessee's choosing to be an important reason why an individual would choose to work as an independent contractor, rather than an employee of a single company. The conversation indicates that without such rights, "if [lessee] were to obtain [the equipment] from the same person with whom he is contracting," and is not able to use it for work for other persons, the lessee would be unable to "furnish" the equipment as required by the statute.

Following the conversation between Senator Groener and Kalinoski, the committee members discussed the possibility of removing the "leasehold interest" language to

address the concerns about the application to a situation where the worker leases equipment directly from the lessor, for the lessor's exclusive use. Kalinoski encouraged the committee to keep the "leasehold interest" language, however, because the language would expand the nonsubject worker status to individuals unable to afford their own equipment, stating "you know how it is to buy." Tape Recording, House Committee on Labor, HB 2726, July 2, 1979, Tape 40, Side 1. As we understand Kalinoski's statement, including the "leasehold interest" language would add an avenue to extend the exemption to individuals that traditionally would be unable to afford to operate as an independent contractor because of the difficulty and expense of purchasing their own equipment. Ultimately, the exemption was enacted with the "leasehold interest" language intact.

Although the exchange between Senator Groener and Kalinoski occurred during a discussion about expanding the subject worker exemption to include equipment other than trucks, such as a backhoe, the conversation addressed the precise fact pattern that is presented here: a lease agreement between an employer and an individual leasing equipment where the lessee is limited to the exclusive use of the equipment for the benefit of the employer-lessor. Both parties to this case point to that interaction to support their positions.

SAIF contends that the legislative history, and especially the interaction between Senator Groener and Kalinoski, supports its plain language interpretation of the statute. In its view, the fact that the legislature contemplated such a situation, and ultimately decided that it did not need to amend the statutory language despite its concerns, demonstrates that "there is no clear legislative intent that in order to have a leasehold interest and furnish the equipment to the for-hire carrier, that the driver must have a leasehold interest that permits him to use the equipment in service of someone other than the lessor." Rather, according to SAIF, the plain text and legislative history both clearly suggest that the exemption was meant to apply to persons who either had a leasehold or ownership interest in equipment and could furnish that equipment in some manner,

regardless of what limitations existed on that equipment pursuant to the lease agreement.

Claimant counters that the conversation between Senator Groener and Kalinoski demonstrates that the legislature's specific intent was the opposite. In claimant's view, the discussion prior to amendment of the statute to include individuals with a "leasehold interest" in equipment shows that the legislature did not intend a purported lease agreement to, by itself, turn an individual into a nonsubject employee. Instead, claimant contends that the excerpts of the discussion between Senator Groener and Kalinoski reveal that the legislature recognized that a lease-back scenario, similar to the situation here, could occur under the terms of the statute, but was not meant to fall within what the legislature intended the statute to cover. Moreover, although Senator Groener did express apprehension about the possibility of that situation occurring, he was assured by Kalinoski directly that that would be an abuse by subterfuge. Claimant argues that the legislative history reveals that the intent of the statute was to exempt owner-operators—those who have a proprietary interest in the equipment and then furnish that equipment to for-hire carriers for transport—from workers' compensation and that there is no legislative intent that suggests the statute was meant to exempt workers in his situation.

We are not persuaded by SAIF's assertions. The conversation between Senator Groener and Kalinoski does demonstrate that the legislature contemplated the situation that is occurring here and was assured that such a possibility would be subterfuge, or an inappropriate use of the exemption. In light of the concerns expressed about this very situation, and the assurance that that was not what the statutory exemption was intended to cover, it is difficult to attribute the meaning proposed by SAIF to the legislature's decision not to change the language in the statute in light of its concerns. Ultimately, the legislature did discuss removing the "leasehold interest" language in the exemption to address this very possibility, but elected to leave the language in place because removing the language would not allow truck drivers the opportunity to lease, rather than

purchase, a vehicle and still maintain status as a nonsubject worker.

The text, context, and legislative history of the subject worker exemption contained in ORS 656.075(15), when considered together, indicate that the legislature did not intend that the exemption cover a situation in which a lessor leases equipment to an individual and then maintains nearly exclusive control over the use of that vehicle. As mentioned, the parties' arguments before this court focused on the meaning of the term "leasehold interest" within the statute and whether the lease agreement between claimant and BMT granted sufficient rights to qualify for the exemption. We agree that that is a portion of the question that must be answered in this case but, as claimant points out, that phrase must be read and considered alongside the entirety of the statute. When evaluating the text of a statute and interpreting what the legislature intended when it enacted that provision, we seek to give effect to every word, where possible. *Crystal Communications, Inc.*, 353 Or at 311. To give effect to every word in the exemption in ORS 656.027(15), we find that a "leasehold interest" under the exemption must allow for more rights than simply driving the equipment for the sole benefit of the lessor in order for the driver to "furnish" that equipment as the provision requires. It is clear from the text of the statute and its legislative history that the exemption requires an ownership or leasehold interest that would permit the lessee to use the equipment in some way other than furnishing, maintaining, and operating the equipment for the exclusive use and at the exclusive direction of the lessor.

Here, claimant entered into a lease agreement with BMT. Although that lease agreement granted claimant the right to "possess" the truck, BMT still exercised significant control over the manner in which claimant could "use" the truck. In a lease agreement, restrictions on use are certainly permissible, even common, and they do not render the agreement to be ineffective. Such restrictions, however, may necessarily control the ability of the lessee to obtain an interest in the property sufficient to furnish it to the extent required to satisfy the exemption in ORS 656.027(15). In this

situation, the restrictions in the lease agreement between BMT and claimant did just that. The terms of the lease agreement between BMT and claimant were so restrictive that claimant was prohibited from using the truck for any business purpose other than those purposes requested by BMT. The lease agreement prevented claimant from being able to "furnish" the equipment as required by the statute. Put another way, the agreement between BMT and claimant placed claimant in nearly the same position as if he was an employee of BMT and not, as the subject worker exemption contemplates, an owner (or lessee)-operator with decision-making ability about who to haul for. As we understand the requirement to furnish the equipment, based on the entire text of the statutory exemption, the lessee must have additional rights beyond the right to make the equipment available to the lessor at its request. The lease agreement in this case does not grant claimant the right to furnish the equipment in that way. Therefore, because the agreement does not grant claimant sufficient authority over the equipment to possess, use, and furnish the equipment as he chooses, he does not qualify for the subject worker exemption in ORS 656.027(15).

### III.   CONCLUSION

In sum, we agree with the Court of Appeals that the subject worker exemption in ORS 656.027(15) requires an ownership or leasehold interest that would allow the lessee sufficient authority or control over the equipment to possess and use, or "furnish," that equipment in some way other than in service of the lessor. The lease agreement between BMT and claimant did not convey such an interest.

The decision of the Court of Appeals and the order of the Workers' Compensation Board are affirmed.

**GARRETT, J.,** dissenting.

I respectfully dissent. I am not convinced that the text or context of ORS 656.027(15) provide a reason to give the terms "leasehold interest" and "furnishes" anything other than their ordinary meanings. The legislative history, far from showing that the legislature intended those words to have an unusual meaning, indicates the opposite.

It confirms that the legislature was aware that those words could encompass the arrangement that occurred in this case. If that result is undesirable, it is the legislature, not this court, that should rewrite the statute.

The relevant exemption defines a nonsubject worker as

"[a] person who has an ownership or leasehold interest in equipment and who furnishes, maintains and operates the equipment. As used in this subsection, 'equipment' means:

"* * * * *

"(c)   A motor vehicle used in the transportation of property by a for-hire motor carrier that is required under ORS 825.100 or 825.104 to possess a certificate or permit or to be registered."

ORS 656.027(15). The dispute in this case turns on the meaning of the first paragraph.

There is little to say about the words "leasehold interest" and "furnish," because the majority and I agree on the ordinary meanings of those terms, and the majority acknowledges that, on their face, they apply to a situation where a person leases equipment and then "furnishes" it by providing hauling services to the lessor. 369 Or at 398. The majority reasons, however, that the legislature must have intended something different because applying the ordinary meanings here would make the terms "duplicative." *Id.* That conclusion seems to be based on the observation that, under the terms of the lease, claimant was not permitted to drive the truck for other companies, so claimant cannot be said to have "furnished" the truck to the company that was the exclusive beneficiary of his services. Thus, the majority frames the question as whether claimant had a "sufficient" leasehold interest here to "furnish" the truck, and it concludes that he did not, because he had no right to use it for any purpose other than driving for the lessor. *Id.* at 404, 405.

The notion of "sufficiency" of the leasehold interest is an odd one. No one suggests that, if the question arose in a different legal context, the arrangement in this case would

be seen as anything other than a lease. Use restrictions are not uncommon in leases, and claimant retained the ability to decide whether or not to drive for the lessor. Thus, the majority is correct that the statute includes two disjunctive requirements, but both are satisfied here: The leasehold interest gave claimant a *right* of possession and use, and he furnished the truck by exercising that right.[1]

The majority relies on legislative history to infer that the words of the statute should be given something other than their ordinary meanings. *Id.* at 404. That analysis confuses the question of what policy objective the legislature hoped to achieve with the question of what the legislature understood the words to mean. I acknowledge that the exchange between Senator Groener and Jack Kalinoski tends to cast doubt on whether at least some legislators intended to promote arrangements like the one in this case, where the leased equipment is furnished back to the lessor. What is more significant is that, after Senator Groener pointed out that the proposed language could lead to exactly that result, he was given an assurance by Kalinoski—an assurance that that result was *unlikely*, not that it was beyond the scope of the words being proposed. The legislative committee then debated whether to change the language, and it ultimately left the provision intact. It would have been possible to amend the bill to exclude certain types of leases, but that did not happen. What the legislative history reveals is that the legislature knew that the proposed wording could produce a certain outcome that might (in the views of some) not be desirable, but it declined to make the further changes necessary to prevent that outcome.

This court has previously recognized, when interpreting statutes, that the legislative record may reveal a "mismatch—or at least, a *potential* mismatch—in the text that the legislature chose for the statute and the policy that the legislature ostensibly sought to effectuate." *State v. Walker*, 356 Or 4, 21, 333 P3d 316 (2014) (emphasis in

---

[1] If claimant had been *compelled* to drive for the lessor, a question might arise whether "furnishing" can consist of compelled action. It is undisputed, however, that claimant determined on his own whether and how much to drive.

original). That is so, among other reasons, because it is common for the legislature to act with a particular purpose in mind but to enact language that reaches more broadly than that original purpose. As we explained in *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986):

> "Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention."

Thus, courts are often presented with situations where broadly worded statutes are applied in ways that may not have been within the original contemplation of the legislature, or that may even be in tension with some indicators of what the legislature was trying to accomplish. In those cases, while it may be tempting to adopt a narrowing construction, it is rarely appropriate to do so unless the terms of the statute are genuinely ambiguous and the legislative history indicates that a particular meaning different than the ordinary meaning was intended.

Absent those circumstances, we should respect what we cannot know about the reasons why the legislature chose the language it did:

> "For instance, lawmakers may believe that defining a narrower class for coverage under a statute would cause more problems in interpretation and administration and would be less efficient than to use broad, residual language that avoids such problems. When the express terms of a statute indicate such broader coverage, it is not necessary to show that this was its conscious purpose. In the absence of an affirmative showing that the narrower meaning actually was intended by the drafters, we shall take the legislature at its word ***."

*Id*.

Here, we know that legislators were made aware of the potential reach of the exemption, and that at least one of them, Senator Groener, was concerned about it. We know that the committee subsequently considered, but did

not adopt, narrowing language. What we do not know is the reason for that. Perhaps the committee concluded that attempting to narrow the statute would create "problems in interpretation and administration." *Id.* Perhaps the committee received additional assurances that industry participants were unlikely to behave in the way that Senator Groener feared, making further amendments seem unnecessary. Perhaps Senator Groener's concerns were not shared by other legislators, who objected to a narrowing amendment on policy grounds.

Given what we know and what we do not, this court would do well to heed what we said in *Walker*:

> "Particularly where the legislative history demonstrates that the legislature was aware of the expansive nature of an enactment's text, yet chose not to narrow it, we are constrained to interpret the statute in a way that is consistent with that text, which is, in the end, the best indication of the legislature's intent."

356 Or at 22. If the lease arrangement in this case is one that the legislature does not believe should trigger the exemption in ORS 656.027(15), the legislature can do what it did not do in 1979, which is to narrow the statute. I respectfully dissent.

Balmer, J., joins in this dissenting opinion.